**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

WASEEM ROSHEN,                          :
                                        :        **Case No. 2:14-CV-260**
              **Plaintiff,**            :
                                        :        **JUDGE ALGENON L. MARBLEY**
       v.                               :
                                        :        **Magistrate Judge King**
INTERNATIONAL BUSINESS,                 :
MACHINES CORPORATION, *et al.,*         :
                                        :
              **Defendants.**           :

## OPINION & ORDER

This matter is before the Court on two motions:  (1) the Motion for Summary Judgment of Defendants International Business Machine Corporation ("IBM"), Sham Vaidya, Krishnan Ramachandran, and Sugandh Mehta (collectively, "Defendants") (Doc. 37); and (2) Defendants' Motion to Strike Plaintiff Waseem Roshen's Contradiction to Sworn Testimony and to Disregard Unsupported Testimony.  (Doc. 62.)  For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike and **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's discrimination and retaliation claims.

## I.      BACKGROUND

### A.  Factual History

#### 1.  IBM's Supervision Structure and Evaluation Procedure

Waseem Roshen, a Muslim of Pakistani origin, worked for the Global Business Services ("GBS") division of IBM from June 2006 until he was laid off on March 28, 2012.  (Compl., Doc. 1 at ¶¶ 14, 26.)  Roshen was 60 years old at the time of the layoff.  (*Id.* at ¶¶ 13; 26.)  In

2006, Roshen began work as a Band 8[1] Advisory Information Technology Architect ("IT Architect") in the GBS Emerging Technology & Architecture ("ET&A") service area. (Deposition of Waseem Roshen, Doc. 37-1 at 158; Declaration of Sham Vaidya, Doc. 37-4 at ¶ 3.) Roshen worked primarily in client offices or remotely from his home. (Vaidya Decl., Doc. 37-4 at ¶ 4.) GBS IT Architects in Roshen's practice area are technical subject-matter experts who provide information technology consulting services to IBM corporate clients. (*Id.* at ¶ 3.) IT Architects work on each client project with a project team, which includes a project leader. (*Id.*) Project leaders provide feedback about an employee's performance on a particular client project to the employee's first-line manager. (*Id.*)

Each IT Architect has a first-line manager and a second-line manager. In 2008, Roshen's first-line manager was Sham Vaidya and his second-line manager was Donna Satterfield. (Roshen Dep., Doc. 37-1 at 31-32, 64.) In 2009 and 2010, Vaidya served as Roshen's second-line manager and Sugandh Mehta was his first-line manager. (*Id.* at 32, 74.) On July 1, 2011, Gary Gerloff became Roshen's first-line manager, Krishnan Ramachandran became his second-line manager, and Vaidya was promoted to third-line manager. (*Id.* at 32; Vaidya Decl., Doc. 37-4 at ¶ 2; Declaration of Gary Gerloff; Doc. 37-5 at ¶ 4.) Vaidya, Ramachandran, and Mehta are all of Indian descent. Satterfield and Gerloff are not of Indian descent. (Gerloff Decl.; Doc. 37-5 at ¶ 3.)

Employees receive an annual review called a Personal Business Commitment ("PBC") evaluation. (*See* PBC Evaluations of Waseem Roshen, Doc. 37-1 Exs. 3-5, 7.) As part of this process, employees ask at least two of their project leaders to submit formal reviews, called Project Assessments, to the employee's first-line manager. (Vaidya Decl., Doc. 37-4 at ¶ 6.)

---

[1] IBM classifies its non-management employees in 10 "Bands," with 10 being the highest ranking non-supervisory Band. (IBM Position Paper to EEOC, Doc. 59-2 at 3 n.2.)

Project leaders may also submit informal assessments. (*Id.*) Finally, the employee completes a self-assessment. (*Id.* at ¶ 7.) The employee's managers then review the Project Assessments, informal feedback, self-assessment, and employee utilization rates.[2] (*Id.* at ¶ 8.) The managers use a "PBC Assist Tool" that calculates a numerical value for an employee's performance across five categories: utilization, delivery, subject-matter expertise, people leadership, and business administration. (*Id.*) After the employees are rated in each area, all managers in the service area "together evaluate the employee's performance through what IBM calls 'Team-Based Decision Making.'" (*Id.* at ¶ 9.) The managers then decide on a final PBC rating for each employee of: 1 (among the top contributors); 2+ (above average contributor; 2 (solid contributor); or 3 (among the lowest contributors for the year). (*Id.* at ¶ 10.) An employee may also receive a score of 4 or 5, both of which are very rare. (*Id.*)

## 2. *Roshen's 2011 Promotion*

In 2008, Roshen asked Vaidya, his first-line supervisor at the time, if he could be considered for a promotion from Band 8 to Band 9. (Roshen Dep., Doc. 37-1 at 267.) Roshen was eventually promoted to Band 9, where he became an Application Architect, on April 1, 2011. (Vaidya Decl., Doc. 37-4 at ¶ 12.) The delay in promotion was a result of IBM's requirement that Band 9 employees possess a certification in their field, and Roshen's inability to procure the certification due to a companywide restriction on travel to certification courses. (Declaration of Stephanie Anderson, Doc. 37-6 at ¶ 6; Roshen Dep., Doc. 37-1 at 69; Roshen

---

[2] An employee's utilization rate reflects her percentages of: (1) billable; (2) chargeable; (3) management-decided; and (4) bid and proposal hours worked each year. (Doc. 37 at 5 n.3.) Billable hours are hours charged to a GBS client project. (Deposition of Tonya Taylor, Doc. 37-3 at 22.) Chargeable time includes both billable time and work on other projects outside GBS. (*Id.* at 24.) Management-decided time constitutes "hours that are typically internally funded hours by GBS" and bid and proposal hours are hours spent for "work on a proposal or a presentation." (*Id.* at 61.)

Dep. Doc. 37-1. Ex. 3, WAR0005-000027.)  Roshen received the certification after the travel restriction was lifted and he completed the course in late 2010.  (Roshen Dep., Doc. 37-1 at 267.) According to Vaidya, he and Mehta recommended Roshen's promotion for April 2011 even though employees typically had to wait until June to be promoted.  (Vaidya Decl., Doc. 37-4 at ¶ 12; Deposition of Sham Vaidya, Doc. 37-17 at 207.)

Mehta stated in his deposition that employees could take architecture thinking classes, which are required for IT architect certification, in two ways: online, and an in-person class which requires travel.  (Deposition of Sugandh Mehta, Doc. 59-6 at 39.)  He stated that he typically asks individuals under his direction to attend the in-person classes because the thinks they are more beneficial.  (*Id.* at 39-40.)  He stated that IBM typically asked individuals seeking to take these classes to attend the classes "in conjunction with the other individuals who were part of the community itself," presumably other IBM employees.  (*Id.* at 41.)  He further stated that he could not recall whether there were any travel constraints during the time in question but that sometimes there were travel constraints during the first and fourth quarters of the year.  (*Id.*) Roshen says that Mehta did not allow him to take the course online, or to travel to the class until late 2010.  (Declaration of Waseem Roshen, Doc. 58-1 ¶¶ at 16-17.)

Roshen states that he knew of other employees who were permitted to travel to the required course during the supposed travel restriction, but he does not mention those employees by name.  (*Id.* at ¶ 15.)  He also avers that although Mehta told him that certification as an IT Architect was required for promotion to Band 9, he later discovered "through research on the IBM's Blue pages that there were many people in the band 9 and band 10 who were not certified."  (*Id.* at ¶ 25.)  He does not offer any names of people who were not certified.  (*Id.*; *see also* Roshen Dep., Doc. 59-8 at 71-72.)

Immediately after receiving notice of his promotion to Band 9, Roshen asked Vaidya if he could be considered for a promotion to Band 10.  (*See* Email Correspondence of Waseem Roshen and Sham Vaidya, Doc. 37-4 at 32.)  Vaidya told him that he was not ready for another promotion (*id.*), and Roshen emailed his third-line manager, Sue Miller-Sylvia, who later told Vaidya and Mehta that she had informed Roshen that he would not be promoted to Band 10 because he had just been promoted to Band 9 and the company would need to determine whether he could "keep himself staffed" at the higher Band 9 rate before IBM could have confidence he could be staffed as a Band 10.  (Email Correspondence of Sham Vaidya and Sue Miller-Sylvia, Doc. 37-9 at Ex. 1.)  She also stated that IBM currently had more Band 10 employees that year than usual, which might make it challenging to promote more employees to Band 10.  (*Id.*)  Finally, she told Roshen that in order to be promoted to Band 10 in a future year he would need to demonstrate an ability to staff himself on projects, get support from partners, and display maturity in leadership with clients and his project team.  (*Id.*)  Miller-Sylvia is not of Indian descent.  (Declaration of Sue Miller-Sylvia, Doc. 37-9 at ¶ 6.)

According to information that IBM produced during discovery, of the 17 employees in the practice area, including Roshen, who were promoted from Band 8 to a higher band between January 1, 2008 and April 1, 2012, nine were over age 40.  (IBM's Responses to Pl.'s First Set of Interrog., Doc. 61-2 at 3-4.)  All 16 of the other employees were at least six years younger than Roshen at the time of their promotion (Roshen was 59 at the time of his promotion to Band 9 on April 1, 2011).  (*Id.*)  Thirteen of them were at least 10 years younger than Roshen at the time they were promoted.  (*Id.*)

Of the six employees in the practice area who were promoted from a Band 9 to a higher band in that same time period, all were between the ages of 41 and 48, which is more than 10

years younger than Roshen was when he asked to be promoted from Band 9 to Band 10.  (*Id.* at 4-5.)

Among the 23 employees in the practice area who were promoted from Band 8 or 9 to a higher band between January 1, 2008 and April 1, 2012, 13 of them held a certification as an IT Architect.  (*Id.* at 6.)  Sixteen held "certifications other than a certification from IBM as an IT Architect."  (*Id.* at 7.)

### 3.  *Roshen's 2011 Projects and Assessments*

In 2011, Roshen worked on seven client projects and was removed from three of them. From April 11-15 and May 30-July 1 he was not engaged in client projects, and from August 22-September 23 and December 12-30 he was engaged in only "intermittent work" for JP Morgan. (Declaration of Tonya Taylor, Doc. 37-16 at ¶ 5.)

In his first project, the Nationwide Project, Roshen received generally positive feedback from his project leader, Elaine Mikesell.  (Nationwide Project Assessment Phase I, Doc. 59-5 at 6.)  In Phase I of the Nationwide Project, which ended in January 2011, Mikesell said that Roshen had been "diligent" and "effective" and noted that she encouraged Roshen to "continue to develop independence with" the System Architect tool.  (*Id.*)  In Phase II of the project, which ended in April 2011, Mikesell summarized her feedback as follows:  "I appreciated having Waseem on the project.  He performed his job with little supervision.  We hope that the engagement provided him with the opportunity to deepen his knowledge of [Enterprise Architecture] and the Rational System Architect.  (Doc. 59-7 at 4.)  She rated Roshen's performance as "good" in all relevant categories, although she also stated that he "had challenges being an apprentice," that she would have liked Roshen to play a bigger leadership role on the

6

project, and that he could have "invested more time learning [the System Architect tool] to achieve a more advanced level." (*Id.* at 3.)

Roshen worked on his second project, for Bank of America, from April 18 to May 27, when he was removed. (Taylor Decl, Doc. 37-16 at ¶ 5.) By all accounts, Roshen and his project leader, Arun Thakore, who is of Indian descent, struggled to work together.

Although Roshen testified in his deposition that he had "long discussions" with Thakore about India and Pakistan and that Thakore had "very, very negative views about Pakistan and the people of Pakistan," he does not point to any record evidence that he told anyone at IBM about these discussions regarding India and Pakistan. (Roshen Dep., Doc. 59-8 at 43.) Roshen did write an email to John Caldwell (Thakore's first-line manager) and Sugandh Mehta complaining about Thakore's unprofessional behavior on the Bank of America project. (Email from Waseem Roshen, Doc. 37-1 at 106.) Although he stated in the email that Thakore frequently "lecture[d]" him, made "degrading comments," and interfered with his work, he did not convey any comments from Thakore about his religion or national origin, nor did he speculate that religious or ethnic animus motivated Thakore's comments. (*Id.*; *see also* Roshen Dep., Doc. 59-8 at 161-62.) Thakore had no role in evaluating Roshen's performance on the Bank of America project or any other project. (*Id.* at 45-46.)

After both Roshen and Thakore complained about the other's performance on the project, Mehta consulted with Caldwell, Thakore's first-line manager, as well as Martin Burns, who was overseeing the project. (Mehta Dep., Doc. 37-8 at 43-44; Declaration of Sugandt Mehta., Doc. 37-11 at ¶ 4.) Upon investigation, Mehta characterized the relationship between Thakore and Roshen as one of a "mutual . . . lack of respect." (Mehta Dep., Doc. 37-8 at 45-46.) He was concerned that the deteriorating relationship between them had resulted in the team failing to

7

deliver a timely, high quality work product to the client. (*Id.* at 46.) He was also concerned that Roshen did not have the knowledge or skills to accomplish the work that the client required. (*Id.*)

Ultimately, Mehta removed Roshen from the Bank of America project, stating that he did so based on a mismatch between Roshen's technical skills and the skills needed for the project. (Mehta Decl., Doc. 37-11 at ¶ 4; *see also* Roshen Dep., Doc. 59-8 at 252.) A formal assessment of Roshen's work on the Bank of America project is not in the record. Mr. Thakore was not removed from the Bank of America project. (*See* IBM's Responses to Pl.'s First Set of Interrog., Doc. 61-2 at 30.) IBM stated during discovery that Thakore's supervisors "verbally counseled" him and that IBM took the conflict between Thakore and Roshen into account when evaluating Thakore's "people leadership skills," a component of his PBC rating. (*Id.*) Had it not taken this conflict into account, IBM maintains that Thakore would have received a 2+ for his overall PBC rating but he instead received a rating of 2. (*Id.*)

On the Express Scripts project, to which Roshen was assigned from July 4 to August 19, when he was removed, his project leader, Timothy Steele, stated in Roshen's evaluation: "I know that this project had aggressive timelines and the client had no documentation. I know you did the best with the time on the project." (Express Scripts Project Assessment, Doc. 59-1 at 3.) Roshen received good ratings for client relationships and teamwork. (*Id.* at 2.) Steele also noted, however, that Roshen did not notify him that he would need more time to complete the project until after the target completion date. (*Id.*) Accordingly, Steele had to reassign to other team members the work Roshen was unable to finish. (*Id.*) Steele also said that he had expected that Roshen, as a Java architect, would have knowledge of how to convert another application to Java but he apparently did not complete this task in a timely manner. (*Id.*) Steele later stated in

his deposition that Roshen was removed from the project "due to the time-line of getting the project deliverables completed and need[ing] to have a senior Java person there to support the team." (Steele Dep., Doc. 37-12 at 24.)

Roshen next worked on the Afore Banamex project from September 26 to October 21. (Taylor Decl., Doc. 37-16 at ¶ 5.) Vincent Wong, his project leader, stated as follows:

> Waseem was very diligent in his review and offered assistance to the team throughout the engagement period. He provided a report on findings and recommendations that was well received by the project team as well as assisted with the validation of some of the estimating parameters the team was using to develop the project estimates. I appreciate the effort Waseem put into his review and his follow-up afterwards. It was a pleasure to have worked with Waseem . . . .

(Afore Banamex Project Assessment, Doc. 59-3 at 2.)

Roshen's next project was for EBX Capital, but neither Plaintiff nor Defendants have submitted evidence relating to Roshen's work on this project. (*See* Taylor Decl., Doc. 37-16 at ¶ 5.)

On his intermittent work for JP Morgan, which took place during the fall of 2011, Roshen also received a positive evaluation from his project leader, Mohammad Ahmad. (*See* JP Morgan Chase Project Assessment, Doc. 59-4.) Ahmad called Roshen "the major contributor to the . . . team" and stated that he provided valuable input and created an excellent work product on two projects for the client. (*Id.* at 2.)

Finally, Roshen worked on the Forrester Research project beginning November 28 until he was removed on December 9 due to "the fast-moving nature of the Forrester project and Roshen's poor performance." (Taylor Decl., Doc. 37-16 at ¶ 5; Declaration of Allan Tate, Doc. 37-13 at ¶ 10.) After Tate became concerned about Roshen's performance on the project, he sent him an email on December 7, 2011 with suggestions to improve Roshen's performance, including arriving between 7:30 a.m. and 8 a.m. when the client typically arrived, fixing his

access to IBM's wireless Internet, posting meeting minutes and recommendations to the team's

blog, posting a daily status report to the blog, and meeting all the delivery dates for his tasks.

(*Id.* at ¶ 7 and Ex. 1.)  Each of the suggestions contained an explanation as to the rationale

behind the suggestion, and Tate also stated:  "None of this is intended to be a personal critique."

(*Id.* at Ex. 1.)  The following day, he had an in-person discussion with Roshen about

performance expectations as well.  (*Id.* at ¶ 8.)  The day after that, December 9, 2011, in response

to Tate's email with specific questions about Roshen's progress, Roshen sent an email to Tate

with an update that Tate did not deem fully responsive to his queries.  (*Id.* at Ex. 1.)  That same

day, Tate decided to remove Roshen from the project due to performance deficiencies that he

later laid out in a December 13, 2011 email to Gerloff, Roshen's first-line manager.  (*Id.* at Ex.

3.)  Specifically, Tate noted Roshen's late arrival times; his inability to initiate suggestions or

make recommendations directly to the client; his minimal written  work product that

"contain[ed] only information [that] was harvested from [client] documents" and "[n]o

identification of gaps, problems or risks"; and his failure to execute several directives from Tate.

(*Id.*)  In response to an email from Roshen asking Tate to clarify the reasons for his removal

from the project, Tate sent an email to Roshen identifying most of the same deficiencies.  (*Id.* at

Ex. 4.)

       Tate also states that he and the IBM partner assigned to the Forrester project were

concerned with the amount of time Rohsen had charged to Forrester over the two-week period

that he was assigned to the project, a total of 102 hours including 22 hours of what Tate

characterizes as "unauthorized overtime."  (*Id.* at ¶ 13.)  Therefore, Tate reduced the number of

hours Roshen charged to the project to 80.  (*Id.*)  In his affidavit, Roshen stated that:  (1) IBM

employees do not receive overtime pay for billing these hours; (2) he had never previously had

his billable hours reduced; and (3) Tate's decision to retroactively reduce Roshen's billable hours was made after Tate removed him from the project.  (Roshen Aff., Doc. 58-1 at ¶ 21.)

### 4.  Roshen's 2008-2011 PBC Evaluations

Roshen received generally positive PBC evaluations in 2008, 2009, and 2010, but his 2011 evaluation indicated a drop-off in his performance.  In 2008, he received an overall rating of 2 (solid contributor).  (2008 PBC, Doc 37-1 at 84.)  The evaluation concluded that he "had a strong year," worked on strengthening his architectural skills, met his commitments to clients, published several papers, lectured in IBM's ambassador program, filed a patent disclosure for quantum computers, and wrote a book on Service Oriented Architecture.  (*Id.*)  Roshen was encouraged to focus in the coming year on "ensuring his utilization levels increases [sic] above the current levels and work[ing] towards certification after travel restrictions have been lifted.  In 2009, Waseem should continue his client work while driving the development of additional architect skills."  (*Id.*)

In 2009, he received an overall rating of 2+ (above average contributor).  (2009 PBC, Doc. 37-1 at 89.)  His then-first-line manager, Mehta, wrote that Roshen "had a strong year," that one of his clients, the Social Security Administration, was "very satisfied" with his performance, and that he worked on "some deep technical discussions" on client projects.  (*Id.*)  The assessment also acknowledged Roshen's contributions in publishing papers and a book and stated that he had "timely supported the business administrative tasks" required in his work.  Finally, in almost identical language to the previous year's assessment, the evaluation recommended that in 2010 he "focus on ensuring his utilization levels increases [sic] above the current levels and work[] toward certification."  (*Id.*)

11

In 2010, Roshen also received an overall rating of 2+ (above average contributor).  (2010 PBC, Doc. 37-1 at 93.)  Mehta again completed his evaluation and noted:  "Besides meeting client commitments, Waseem's contributions in publications, patent filings and invention disclosure continues to grow."  (*Id.*)  In 2011, the company's goals for Roshen were to "continue his client work while driving the development of additional architect skills."  (*Id.*)

In 2011, Roshen's first-line manager, Gary Gerloff, conducted his PBC evaluation.  (2011 PBC, Doc. 37-1 at 100.)  Roshen's overall rating was a 3 (among the lowest contributors this year, needs to improve).  (Id. at 98.)  At the time of the 2011 PBC ratings, 12 employees in the ET&A practice area received a rating of 1, 25 employees received a rating of 2, 25 employees received a rating of 2+, and only 4 employees received a rating of 3.  No employees received a rating of 4 or 5.  (IBM's Responses to Pl.'s First Set of Interrog., Doc. 61-2 at 17-18.)

The 2011 PBC evaluation stated that Roshen missed his utilization target by more than 20%, and that he was released from the Bank of America-Capacity Planning and Forrester projects, which decreased his utilization numbers.  (Doc. 37-1 at 98.)  Gerloff stated that during these two projects and one of his Nationwide projects he had "relationship difficulties with other team members and miscommunications concerning responsibilities and delivery expectations."  (*Id.*)  Further, Roshen's "delivery work at Nationwide was viewed as satisfactory but below what is expected of someone at his band."  (*Id.*)  Specifically, Gerloff cited feedback from project leaders that there was confusion over his deliverables and dates on the Express Scripts project and that he did not show leadership skill on the Nationwide project.  (*Id.*)  He did note that Roshen received positive feedback on the JP Morgan and Banamex projects, and that Roshen's contributions to IBM's intellectual capital were exceptional, as he received two patent awards, wrote four papers, and made a presentation.  (*Id.*)  On the other hand, Gerloff stated that

Roshen's "impressive [intellectual capital] contributions versus low performance on projects stand in stark contrast."  (*Id.*)  Intellectual capital contributions amounted to only 10% of Roshen's overall performance evaluation.  (*Id.*)

Roshen submitted a response to the PBC evaluation to IBM management, stating that he believed it was "unjust and unsupported by the relevant facts and data."  He did not allege discrimination or retaliation at that point.  (*Id.* at 99.)

### 5.  *The Reduction in Force and Roshen's Termination*

In early 2012, IBM announced that it would conduct a mass layoff, which in corporate speak it termed a "resource action."  (Vaidya Decl., Doc. 37-4 at ¶ 14.)  Managers from each service area were directed to analyze their "business results and forecasted business to determine which positions had excess resources within the service area."  (Anderson Decl., Doc. 37-6 at ¶ 8.)  The Court takes the word "resources" here to mean "employees."

In the EA&T practice, Vaidya conducted this assessment and identified the Band 9 Application Architect role as having "excess resources," or more staff than necessary during a period of cutbacks.  (Vaidya Decl., Doc. 37-4 at ¶ 15.)  At that time, Roshen and three other employees were classified as Application Architects.  (*Id.*)  Stephanie Anderson, an Area Human Resources Partner at IBM, then prepared a Staff Reduction Excel Worksheet for each position that would be eliminated, including the Application Architect position.[3]  (Anderson Decl., Doc. 37-6 at ¶¶ 3, 8.)  Anderson customized the Worksheet for the Application Architect position to reflect the skills identified as part of the skill set for the position.  (*Id.* at ¶ 9.)  She also populated the Worksheet with the PBC ratings for the three most recent years for each Application

---

[3] Human Resources Partners used a similar spreadsheet, customized for the skill sets identified, for each job that was eliminated during the 2012 "Resource Action."  (Anderson Decl., Doc. 37-6 at ¶ 8.)

Architect.  (*Id.*)  Vaidya then completed the worksheet by evaluating each employee's skill level for each of four identified skills[4], and based on these criteria, selected Roshen to be laid off.  (Vaidya Decl., Doc. 37-4 at ¶¶ 16-17.)  His selection was reviewed and approved by Anderson and Service Area Leader Miller-Sylvia.  (*Id.*)  Vaidya also identified five other individuals from the EA&T practice area to be laid off using the same methodology and Worksheet.  (*Id.* at ¶ 18.)

In late February 2012, Ramachandran notified Roshen that his employment would be terminated effective March 28, 2012.  (Declaration of Krishnan Ramachandran, Doc. 37-7 at ¶ 3.)  A total of 54 GBS Application Innovation Services employees were laid off in IBM's 2012 reduction in force.  (Anderson Decl., Doc. 37-6 at ¶ 12.)  Roshen was 60 years old at the time of the layoff.  (IBM's Responses to Pl.'s First Set of Interrog., Doc. 61-2 at 11.)  The ages of the four other individuals who were subject to the 2012 First Quarter Resource Action in the ET&A practice area were 48, 51, 58, and 60.  (*Id.*)  There were 60 individuals in that practice area who were not laid off, and their ages ranged from 36 to 64.  (*Id.* at 11-13.)  Of those 60 individuals, 41 were more than six years younger than Roshen, and 27 were more than 10 years younger than Roshen.  (*Id.*)

## B.  Procedural History

Roshen filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on September 3, 2012, and the EEOC issued a right-to-sue letter on January 21, 2014.  On March 18, 2014, Roshen commenced this lawsuit for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and Ohio anti-discrimination statutes.  (Compl., Doc. 1.)  Specifically, he alleges that

---

[4] The Worksheet contained letter ratings of L, M, and H for each of four skills for each employee.  The worksheet does not specify, and the parties have not informed the Court, what specific skills were evaluated for Application Architects.

Defendants discriminated against him on the basis of religion, national origin, and age, and retaliated against him for reporting the discrimination to company representatives.  (*Id.* at ¶¶ 45-57, 63-67.)  He further alleges that Defendants discriminated against him on the basis of religion, national origin, and age and retaliated against him in violation of Ohio Revised Code § 4112. (*Id.* at ¶¶ 54-62.)

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992).  Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52).  In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party.  *United States S.E.C. v. Sierra Brokerage Servs.,*

*Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party.  *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III.     ANALYSIS

### A.  Motion to Strike

As a preliminary matter, Defendants ask the Court to strike paragraph 15 of Roshen's affidavit and disregard other sections of the affidavit, which they claim are inadmissible or unsupported and cannot be considered on a motion for summary judgment.  Paragraph 15 of the affidavit reads as follows:

> I knew that many other employees were able to travel and take the required Architectural thinking class in the period 2008-2010.  These employees then got certified as IT Architect and were promoted.

(Roshen Aff., Doc. 58-1 at ¶ 15.)  Defendants contend that this testimony directly contradicts Roshen's earlier deposition testimony, in response to questions about when an Indian IBM employee, Kaizer Sheriff, was permitted to travel to a certification class, in which Roshen stated: "I don't know, but I have a strong suspicion it was in 2008 or early part of 2009."  (Roshen Dep., Doc. 59-8 at 95.)  Roshen elaborated that he "[did not] have that time period" when questioned if he actually knew when Sheriff traveled to the class.  (*Id.* at 97.)

A nonmoving party cannot defeat a motion for summary judgment "simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  In deciding the admissibility of a post-deposition affidavit at the summary judgment

stage, a district court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony."  *Aerel, S.R.L v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  If so, the affidavit should be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction."  *Id.*  If there is no direct contradiction, the district court "should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'"  *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  In *Aerel*, the Sixth Circuit adopted three non-exhaustive factors, originally set forth by the Tenth Circuit in *Franks*, for courts to consider in determining whether the nonmoving party has attempted to use the affidavit to create a sham fact issue:

> [W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Id.* at 909 (quoting *Franks*, 796 F.2d at 1237) (alteration in original).

Here, Roshen urges the Court to find that the affidavit does not directly contradict his deposition testimony because that testimony merely conveyed that he did not know the specific dates when other employees, including Sheriff, traveled to certification classes.  (Doc. 64 at 1.) The Court agrees that the affidavit does not directly contradict the deposition testimony, because the affidavit only states generally that in the period between 2008 and 2010 Roshen had knowledge that other employees traveled to certification courses, whereas the deposition testimony was in response to questions attempting to pinpoint the exact times that Sheriff and other employees traveled to the certification courses.  Nevertheless, the Court will strike the affidavit because it constitutes an attempt to create a sham fact issue under *Aerel*.  The *Aerel* factors all weigh against Roshen.  First, he was cross-examined during the earlier testimony.  *See*

*Franks*, 796 F.2d at 1237.  Second, even if he did not have access to the pertinent evidence at the time of the earlier testimony he stated that he "probably could look it up," and there is no evidence that he did so, in light of the fact that his affidavit offers no names of employees who traveled during the period in question.  Third, he does not attempt to explain his earlier deposition statement by offering any further details in his affidavit.  *Cf. Aerel*, 448 F.3d at 909 (finding that the third factor weighed in favor of the nonmoving party because during the deposition opposing counsel quickly shifted the line of questioning to other topics without fully exploring the issue, and the affidavits revealed further information to explain the issue).

Defendants next ask the Court to disregard paragraphs 6, 11, 16-19, and 27 of Roshen's affidavit on the grounds that they are hearsay statements, as well as paragraphs 9, 18, 23, 25, and 31-33 because they are "unsupported conclusions amounting to nothing more than Roshen's opinions."  (Doc. 62 at 7.)  Therefore, Defendants contend, the Court should disregard these paragraphs under Federal Rule of Civil Procedure 56, which requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  The Court finds that Roshen's affidavit does indeed contain some statements that are inadmissible, and although the Court will not strike any portions thereof, it will consider only evidence that would be admissible under Rule 56 in ruling on Defendants' Motion for Summary Judgment.  *See Wachenschwanz v. Dolgencorp, LLC*, No. 2:12-CV-1037, 2014 WL 907249, at *5 (S.D. Ohio Mar. 7, 2014).  The Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike.

### B.  Discrimination Claims

Title VII prohibits an employer from discriminating against any individual based on that individual's religion, national origin, or other protected characteristic.  *See* 42 U.S.C. § 2000e-2(a)(1); *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014).  A plaintiff may prove disparate treatment on the basis of religion or national origin in two ways: direct evidence of discrimination or circumstantial evidence that creates an inference of discrimination.  *Id.*  The Court analyzes discrimination claims under the ADEA and § 4112 of the Ohio Revised Code under the same analytical framework as Title VII discrimination claims.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003).

Roshen has not introduced direct evidence of disparate treatment or harassment on the basis of religion, national origin, or age.  Therefore, the Court applies the burden-shifting framework for circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, Plaintiff must make a prima facie case of discrimination by showing that: (1) he was a member of a protected class[5]; (2) he was subject to an adverse employment action; (3) he was qualified for the job; and (4) for the same or similar conduct, he was treated differently from similarly situated employees outside the protected class or replaced by someone outside the protected class.  *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).  If, however, the discrimination allegations arise from a workforce reduction, the fourth prong requires the plaintiff to demonstrate "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  *Campbell v. PMI*

_____

[5] For age-discrimination claims, persons over the age of 40 at the time of the adverse employment action are members of a protected class.  *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001).

*Food Equip. Grp., Inc.*, 509 F.3d 776, 785 (6th Cir. 2007) (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993)).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). After the defendant meets its burden, the plaintiff must then demonstrate that the defendant's explanation was a pretext for discrimination. *Id.* The burden to show pretext requires a plaintiff only "to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted). A plaintiff may demonstrate pretext by showing that the proffered nondiscriminatory reasons had no basis in fact, were insufficient to motivate the adverse action, or did not actually motivate the action. *Harris v. Metro. Gov't of Nasvhille & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

As a threshold matter, Plaintiff has waived his religious discrimination claim. His brief in opposition to Defendants' summary-judgment motion refers only to his age and national-origin discrimination claims. A plaintiff abandons a claim when failing to respond to a defendant's motion for summary judgment on the claim. *Graham v. American Cyanamid Co.*, 350 F.3d 496, 506 (6th Cir. 2003); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006). *See also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute."). Because Roshen does not mention religious discrimination in his briefing in opposition to Defendants' summary-judgment motion, he has waived this claim.

As to the remaining discrimination claims, for age and national-origin discrimination, Defendants concede that IBM took an adverse employment action against Roshen—at least as to his termination—and that he was qualified to work at IBM.  (Doc. 37 at 13-14.)  They contend, however, that he can demonstrate neither that Defendants were aware that he was a member of the protected classes of native Pakistanis or persons over the age of 40, nor that he was treated differently than similarly situated non-protected employees.  (*Id.* at 14.)

### 1.  Protected Status

Defendants insist that IBM does not maintain records of its employees' religion or national origin and had no knowledge that Roshen was of Pakistani origin.  (*See* Anderson Decl., Doc. 37-6 at ¶ 13.)  They further contend that at the time of the events in question, Vaidya and Ramachandran were unaware of Roshen's national origin, religion, and age, and Mehta was aware of his religion but not his national origin or age.

It appears that Defendants concede that IBM was aware of Roshen's age—as they must, because it would be odd for an employer not to have a record of an employee's date of birth.  As to the individual Defendants, it strains the Court's credulity that none of Roshen's supervisors would have been aware that he, a 60-year-old man at the time he was terminated, was over 40 years of age, which under the ADEA constitutes membership in a protected class.  *See Harris*, 594 F.3d at 485.  If decision-makers could shield themselves from liability by disclaiming knowledge of an employee's exact age, the purpose of the ADEA would be undermined.  The Court concludes that a reasonable jury could, upon evaluating testimony from Defendants that they did not know that a 60-year-old man was older than 40, find such a contention not to be credible.

Roshen also stated in his declaration that he posted his resume and personal information to IBM's "Blue Pages," an online database accessible to all employees, which indicated that he received degrees from two universities in Pakistan in 1971 and 1973.  (Roshen Aff., Doc. 58-1 at ¶ 5.)  In his briefing, he avers that his name is traditionally Pakistani, he speaks with a Pakistani accent, and he looks distinctly Pakistani.  (Doc. 58 at 17.)  In his deposition, Roshen stated that he had many conversations at IBM in which he discussed his national origin and religion, but he could not recall exactly on what occasions he had such conversations and with whom, other than Arun Thakore, the Bank of America project leader.  (Roshen Dep., Doc. 59-8 at 250-51.)

Defendants rely on *Johnson v. Northwest Airlines* for the proposition that an employer is not liable under Title VII if he could have discovered a plaintiff's race but did not.  53 F.3d 331, 1995 WL 242001, at *3 (6th Cir. Apr. 24, 1995) (unpublished table decision).  But in that case, the managers who investigated the plaintiff after suspicion that he had stolen funds had never met him until the disciplinary hearing, the final step of the investigation, at which point in the process it was a foregone conclusion that the plaintiff would be fired unless he could account for the missing funds.  *Id.* at *2.  In an unpublished opinion, the Sixth Circuit found that evidence that one of the investigators had spoken to another manager who did know that the plaintiff was black was not sufficient to satisfy this prong of the prima face case because there was no evidence that the other manager conveyed that information to the investigator.  *Id.* at *3.  Similarly, in another unpublished opinion, *Philbrick v. Holder*, the Sixth Circuit upheld a grant of summary judgment to the employer on a race-discrimination claim where the ultimate decision-maker in the case had no memory of meeting her, rejecting the plaintiff's argument that the decision-maker should have inferred her race based on the agency's workforce demographic statistics.  583 F. App'x 478, 483 (6th Cir. 2014).

Here, although Vaidya, Ramachandran, and Mehta have all testified that they were not aware that Roshen was of Pakistani origin, there is no dispute that they have met him and spoken with him.  IBM makes much of the fact that Application Architects worked largely at client sites and did not have daily face-to-face interactions with their managers, but at oral argument they conceded that all three individual defendants had met and worked with Roshen.  Given that Roshen worked at IBM for many years and posted his educational credentials from a Pakistani university on his employee page, that his name is Pakistani and he speaks with a Pakistani accent, and that he had general conversations with coworkers revealing his national origin and religion, the Court finds that for purposes of the prima facie case, Roshen has established that he was a member of a protected class and that the three individual Defendants were aware of that fact.  And as his employer, IBM would certainly have had access to Roshen's resume with his educational information as well.  Therefore, the Court finds that Roshen has established the first prong of the prima facie case as to both his age and national-origin discrimination claims.

## 2.  *Similarly Situated*

In order to show that he was treated differently than a similarly situated employee outside the protected class, Roshen must show that he was similar to such an employee "in all *relevant* respects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original).  Defendants contend that he has not done so, and that in any event he cannot meet the heightened standard of showing that he was impermissibly singled out for discharge.   The Court will first address this prong as it pertains to his age discrimination claim and then turn to his national-origin claim.

Roshen first attempts to show that he has established the "similarly situated" prong of his prima facie case for age discrimination as to his failure to be promoted until after he was

permitted to travel to the certification class.  He contends that this prong is satisfied because many of the other Band 8 employees who were promoted to a higher band were significantly younger than he.  The problem with this argument is that he has not introduced any evidence to suggest that these employees were permitted to take the certification class online, or to travel to the class despite the travel restrictions[6], or that they were promoted without *any* kind of certification (as opposed to the specific certification Roshen eventually received).  Such evidence could indicate differential treatment, but there is absolutely none of it in the record.  For instance, in Defendants' responses to Plaintiff's first set of interrogatories, Defendants revealed that of the 23 employees who were promoted from Band 8 or 9 to a higher band between January 1, 2008 and April 1, 2012, 13 of them held a certification as an IT Architect, and 16 held a certification other than a certification as an IT Architect.  (Doc. 61-2 at 6-7.)  Plaintiff has not made a case that any of the 23 employees were promoted without any certification at all, or that any of them received differential treatment with regard to taking the certification course.

As to differential treatment regarding the layoff, Roshen points to a 40-year-old employee who scored a 2 out of a maximum of 7 on her utilization rating but was nevertheless retained by IBM (Roshen's utilization score was a 3).  (Doc. 58 at 18; Doc. 36-1 at 3, line 61.)  The utilization rating was only one of several ratings used to calculate the overall PBC rating, and this particular employee's PBC rating was a 2.  (*Id.*)  Therefore, even though this employee was not terminated and was 40 years old—twenty years younger than Roshen, which is more than enough to satisfy the fourth prong of a prima facie case for age discrimination, *see Grosjean*

---

[6] As discussed in Section III(A), *supra*, the Court has stricken Roshen's affidavit testimony that he knew that other employees were permitted to travel and take the required Architectural thinking class from 2008-2010 because it contradicts his deposition statement.  In any event, he has not pointed to which employees were permitted to travel or take the course online and, therefore, this argument lacks merit.

*v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)—Roshen cannot show that he and the other employee are "similar in all *relevant* respects," *Ercegovich*, 154 F.3d at 353, because she received higher ratings than he did in other areas and an overall higher PBC score.

Roshen acknowledged at oral argument that this is a reduction-in-force case and that, therefore, as to his termination he must meet a higher burden to make out his prima facie case.  A work force reduction occurs "when business considerations cause an employer to eliminate one or more positions within the company" and a new employee is not hired or reassigned to perform the plaintiff's duties.  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).  Since IBM laid off 54 employees, including Roshen, this qualifies as a reduction-in-force case.  Therefore, in establishing the fourth prong of the prima facie case, Roshen must introduce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  *Id.*  For instance, a plaintiff can establish he was singled out in the context of an age-discrimination case if he shows that he "possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff" or that "the employer made statements indicative of a discriminatory motive."  *Id.* at 1466.

Based on his rating of 3 on the 2011 PBC, as well as his being removed from three projects in 2011 and the negative feedback he accrued on the projects, the Court sees no evidence that Roshen was impermissibly singled out for termination.  Roshen cannot point to any statements made by any of the three individual Defendants or others in IBM management indicating a discriminatory motive, nor to any other employees other than the 40-year-old female employee who scored a 2 out of 7 on her utilization rating but was not fired,  a fact that on its own is insufficient to show that Roshen possessed qualifications superior to hers.

As to Roshen's statistical evidence, the Sixth Circuit has said that: "For statistics to be valid and helpful in a discrimination case, 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 524 (6th Cir. 1997) (quoting *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987)). Further, "[a] sample which is too small can undermine the probative value of the statistical evidence." *Id.* (holding that a sample size of 13 employees is too small). To the extent that Plaintiff has offered any statistical evidence at all, it is Defendants' responses to Plaintiff's interrogatories regarding the ages of the ET&A employees who were terminated during the 2012 layoff and those who were not. But Plaintiff offers no analysis of this data. To the extent that the Court can glean any useful information from it, there is no evidence, even if many employees who were substantially younger than Roshen were retained while he was terminated[7], that he was similarly situated to these employees in the relevant respects. Therefore, Plaintiff cannot establish the fourth prong of his prima facie case, especially under the heightened standard for reduction-in-force cases.

As to his claim for national-origin discrimination, although Roshen briefed the issue of whether Defendants had knowledge of his Pakistani national origin, he essentially offers no argument regarding the similarly-situated prong on this claim. (*See* Doc. 58 at 18.) Although IBM responded during discovery that it does not keep a record of the national origins of its employees, and therefore Roshen might have faced an uphill battle to establish this prong, he does not point to even one employee outside the protected class who was treated more favorably than he, and was similar to him in the relevant respects. And he has certainly not shown that he

---

[7] The Sixth Circuit has defined "substantially younger" as at least 10 years, or in some cases six years, younger. *See Grosjean*, 349 F.3d at 336, 340.

was impermissibly singled out for termination.  Therefore, the Court finds that Roshen has not

made out a prima facie case of either national-origin or age discrimination because he has not

shown that similarly situated employees outside the protected classes of persons over age 40 and

persons of Pakistani descent were treated differently than he was, or that he was impermissibly

singled out for termination.  The Court **GRANTS** Defendants' Motion for Summary Judgment

on Roshen's state and federal discrimination claims.

### C.  Retaliation Claims

Under Title VII, it is unlawful for an employer to "discriminate against . . . [an] employee

. . . because [the employee] has opposed any [unlawful] employment practice, or because [the

employee] has made a charge" that the employer has engaged in an unlawful employment

practice."  42 U.S.C. § 2000e-3(a).  Unlawful employment practices under Title VII "include any

actions taken on the basis of race, color, religion, sex, or national origin that 'discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment.'"  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008)

(quoting 42 U.S.C. § 2000e-2(a)(1)).

A plaintiff who alleges retaliation may establish the claim through direct or

circumstantial evidence.  *Id.*  If a plaintiff relies on only circumstantial evidence, as is the case

here, she must produce evidence of a prima facie case of retaliation by showing that:  (1) she

engaged in protected activity; (2) the defendant was aware that the plaintiff had engaged in

protected activity; (3) after the plaintiff engaged in the protected activity, the defendant took an

adverse employment action against her; and (4) there was a causal connection between the

protected activity and the adverse employment action.  *Yazdian v. ConMed Endoscopic Tech.,*

*Inc.*, 793 F.3d 634, 649 (6th Cir. 2015).  Retaliation claims under the ADEA and corresponding

27

Ohio law are analyzed under the same framework as Title VII retaliation claims.  *Imwalle*, 515 F.3d at 544.

If the plaintiff produces enough evidence to make a prima facie case of retaliation, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for its action.  *Yazdian*, 793 F.3d at 650.  If the defendant meets that burden, then the plaintiff must produce evidence to show that the defendant's proffered reason is pretext for retaliation.  *Id.*  As in a discrimination claim, the plaintiff may establish pretext "by showing (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his [termination], or (3) that they were *insufficient* to motivate discharge."  *Id.* at 651 (alteration and emphases in original) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)).

Roshen conceded in his deposition that he did not raise any claims of discrimination until after he was informed that he would be laid off.  (Doc. 37-1 at 37, 47-48.)  Therefore, he cannot satisfy the third prong of the prima facie case that requires, for obvious reasons, that the protected activity take place *before* the defendant takes an adverse employment action against the plaintiff.

In his response to Defendants' Motion for Summary Judgment, Roshen attempts to save his retaliation claim by alleging that IBM's letter to the EEOC in response to Roshen's EEOC complaint—filed after his termination—constitutes an adverse action against the Plaintiff, taken in retaliation for his complaints about discrimination.  (Doc. 58 at 6-7.)  First, the Court need not consider this new spin on his retaliation claim because Roshen did not plead it in his complaint.  (*See* Compl., Doc. 1 at ¶¶ 49-53; ¶¶ 58-62.)  The preliminary pretrial order in this case set a deadline of August 15, 2014 for the submission of all motions or stipulations for leave to amend

the pleadings.  (Doc. 18 at 2.)  Roshen did not file such a motion, and he may not now seek to plead a different theory than he did in his complaint.  *See Vaughn v. City of Lebanon*, 18 F. App'x 252, 272 (6th Cir. 2001) (citing *Young v. City of Mount Ranier*, 238 F.3d 567, 576-77 (4th Cir. 2001)); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

Secondly, even if the Court did consider this claim on the merits, it still fails because Plaintiff cannot show that IBM's letter to the EEOC in response to the complaint constitutes an adverse action.  It would, of course, make little sense to suggest that an employer's letter to the EEOC in response to an employee's employment-discrimination complaint would constitute an adverse action, because in that case anytime an employer responded to defend itself against an EEOC charge, the response could constitute an adverse employment action.

Moreover, the Sixth Circuit has made clear that an adverse employment action in the retaliation context is one that could "significantly impact an employee's wages or professional advancement."  *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007). Such a post-termination action could not have had an impact on Roshen's wages or advancement at IBM because he no longer worked there.  *See Sanford v. Main Street Baptist Church Manor, Inc.*, 327 F. App'x 587, 597 (6th Cir. 2009) (a post-employment decision to challenge a plaintiff's unemployment benefits does not constitute a tangible employment action in a sexual-harassment claim).

The Court **GRANTS** Defendants' Motion for Summary Judgment on Roshen's retaliation claims under state and federal law.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike (Doc. 62) and **GRANTS** Defendants' Motion for Summary

Judgment (Doc. 37) on Plaintiff's discrimination and retaliation claims under both federal and state law.  This case is **DISMISSED**.  The clerk is directed to enter judgment for Defendants.

      **IT IS SO ORDERED.**

 

              **s/ Algenon L. Marbley**
              **ALGENON L. MARBLEY**
              **UNITED STATES DISTRICT JUDGE**
**DATED: March 14, 2016**